*370 ANDREWS, Presiding Judge,
dissenting.
Six Flags was entitled to judgment as a matter of law on Joshua Martin’s premises liability claim under OCGA § 51-3-1 seeking to hold Six Flags liable for injuries Martin suffered in a third-party criminal attack on public property which was not part of the Six Flags premises or approaches. Because Martin failed to produce evidence at trial sufficient to sustain his claim under OCGA § 51-3-1, the trial court erred by denying Six Flags’ motions for a directed verdict and judgment notwithstanding the verdict. It follows that the judgment entered on the jury verdict in favor of Martin should be reversed and the case remanded in Case No. A15A0828 with direction that judgment be entered in favor of Six Flags. In the cross-appeal in Case No. A15A0829, Martin’s claim that he was entitled to additional jury instructions is without merit, and his claim related to post-judgment interest on the judgment is moot. There is no basis for a retrial on any issue raised in the appeal or cross-appeal. I respectfully dissent.
After leaving the Six Flags Over Georgia amusement park, Joshua Martin suffered a serious brain injury caused by an unprovoked criminal attack by a group of people who left the park shortly after Martin. The attack occurred at the Cobb County Transit bus stop on public property owned by Cobb County located about 200 feet from the park premises. Martin filed a premises liability suit pursuant to OCGA § 51-3-1 against Six Flags Over Georgia, LLC, which owns the park, and Six Flags Over Georgia II, L.P., which leases and operates the park (jointly referred to as Six Flags).[66] Martin alleged under OCGA § 51-3-1 that the proximate cause of the criminal attack and his injury was the failure of Six Flags to exercise ordinary care to keep the park premises and approaches safe for him as an invitee at the park. The suit was tried before a jury which rendered a verdict in favor of Martin for damages in the amount of $35,000,000. Based on the jury’s verdict assessing 92 percent of the fault to Six Flags, the trial court entered judgment against Six Flags in the amount of $32,200,000, plus $541,093.12 for prejudgment interest, plus court costs and post-judgment interest.
On appeal, Six Flags contends that the trial court erred by refusing to grant it judgment as a matter of law on Martin’s premises liability claim on grounds asserted at trial in support of its unsuccessful motions for a directed verdict and for judgment notwithstanding the verdict. Six Flags contends that it was entitled to judgment as *371 a matter of law on the claim under OCGA § 51-3-1 because the evidence at trial showed: (1) that the criminal attack on Martin occurred after he had left the park; (2) that the attack occurred at a location that was not on the park premises or approaches; (3) that the attack occurred on Cobb County public property in which Six Flags had no rights of ownership or control sufficient to give it the ability to prevent the attack; and (4) that for these reasons Six Flags had no duty or liability under OCGA § 51-3-1. For the reasons that follow, I agree with Six Flags that the trial court erred in denying the motions, and find that Six Flags was entitled to judgment as a matter of law on Martin’s premises liability claim under OCGA § 51-3-1.
Martin’s cause of action to recover damages for the injuries he suffered in the criminal attack set forth a premises liability claim against Six Flags based on OCGA § 51-3-1, which provides:
Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe.
The duty under OCGA § 51-3-1 to exercise ordinary care to keep the premises and approaches safe for invitees does not require the premises owner[67] to ensure the safety of invitees from criminal attack by third persons. Days Inns of America v. Matt, 265 Ga. 235, 236 (454 SE2d 507) (1995). Under OCGA § 51-3-1, the premises owner has a duty to exercise ordinary care to protect an invitee from a criminal attack only where the criminal act was foreseeable. Sturbridge Partners v. Walker, 267 Ga. 785, 785-786 (482 SE2d 339) (1997). A criminal act against an invitee is foreseeable if it is substantially similar in type to previous criminal activities occurring on or near the premises. Id. at 786. Moreover, as OCGA § 51-3-1 plainly states, the duty “to exercise ordinary care in keeping the premises and approaches safe” requires the premises owner to protect invitees from unsafe conditions, including foreseeable criminal acts, which occur on “the premises and approaches” controlled by the premises owner. See Todd v. F.W. Woolworth Co., 258 Ga. 194, 196 (366 SE2d 674) (1988); Motel Properties v. Miller, 263 Ga. 484, 486 (436 SE2d 196) (1993).
The evidence at trial showed the following regarding the attack and where it occurred: On the day of the attack, Martin had been an *372 invitee at the Six Flags amusement park. Shortly before the 9:00 p.m. closing time at the park, Martin (accompanied by two friends) left the park, walked about 200 feet down Six Flags Parkway (a public street), away from the park to the intersection of the Parkway with South Service Road (another public street), then walked down South Service Road to a nearby hotel where they used the restroom. After using the restroom, Martin and his friends walked back to the intersection of Six Flags Parkway and South Service Road, where the Cobb County Transit (CCT) bus stop was located on public land adjacent to the public streets. When they arrived at the bus stop, they had missed the 9:00 p.m. bus. So they walked the 200 feet back down Six Flags Parkway toward the park and sat on a rail near the park entrance to wait on the next bus. Although not inside the park, which had already closed, the rail was on property owned by Six Flags in front of the park. The area in front of the park was crowded at the time with numerous Six Flags customers still leaving the area. From that location, Martin and his friends saw a group of people in the area wearing similar clothing (matching t-shirts), and left the rail area, and walked 200 feet away from the park down Six Flags Parkway to the CCT bus stop where they waited for the bus. At the bus stop, Martin and his friends heard somebody yell something, at which point the group they had just seen in front of the park attacked them without provocation. One of the group members hit Martin with brass knuckles, knocking him to the ground, and numerous other members of the group continued the attack by stomping on Martin. One member of the group that attacked Martin at the bus stop said he saw Martin and his friends at the rail in front of the park, and saw them walk toward the CCT bus stop down the side of Six Flags Parkway. According to this group member, the group then walked to the bus stop in the median of the Parkway and “wasn’t really following them to the bus stop, we was going to the bus stop.” At the bus stop, one of the group said, “Let’s go fight these dudes over here.” At that point, a member of the group initiated the unprovoked attack by walking over to Martin at the bus stop and punching him. The evidence shows that the attack occurred about 200 feet from the Six Flags park premises at the CCT bus stop, which was located on public property owned by Cobb County adjacent to the intersection of two public streets (Six Flags Parkway and South Service Road) also owned by Cobb County.
At trial, Martin contended that the criminal attack against him at the CCT bus stop was foreseeable, and that Six Flags breached a duty under OCGA § 51-3-1 to exercise ordinary care to prevent the foreseeable attack. As to foreseeability of the attack, the evidence showed: About a year prior to the attack on Martin, a shooting occurred at the MARTA bus stop located at the time on the Six Flags *373 park premises near the West parking lot adj acent to the park entrance. Three people at the bus stop, none of whom were the intended victims, were wounded by gunshots fired at the intended victim by a gunman in a passing car. There was evidence that the shooting occurred after a gang-related fight in the park caused one gang member to shoot at another gang member after they left the park. Six Flags was aware that the park was located in a high crime area of Cobb County. Six Flags was aware that groups of people in the park wearing clothes with matching colors were associated with being gang members. Six Flags was aware of gang-related graffiti in the park, and also knew of gang-related graffiti in the locker room that Six Flags provided for its male employees at the park. Six Flags knew that some of its employees were gang members, and knew that gangs could be violent. In a five-year period prior to the attack on Martin, the record showed over 50 reports inside the park (documented by Six Flags security and Cobb County police) which showed incidents with some degree of violent behavior involving Six Flags employees and customers, including disorderly and unruly conduct, fighting, pushing and shoving, verbal cursing and threats, and criminal trespass. A Cobb County police officer who worked off-duty for Six Flags providing security at the park said he was aware of gang-related graffiti at the park, and sometimes saw groups dressed alike “causing problems” at the park, but that there was no gang violence at the park. As to the attack on Martin at the CCT bus stop, the same Cobb County officer said that Cobb County police had made prior disorderly conduct arrests in the bus stop area, but there had been no fighting incident in any area around the CCT bus stop prior to the attack on Martin. He also said that he was aware of no prior attack like the attack on Martin occurring in or around the park. Six Flags knew from experience that disputes that started inside the park had the potential to create “spillover violence” that continued outside the park.
Additional evidence at trial showed: The group that attacked Martin at the CCT bus stop shortly after the park closed at 9:00 p.m. included off-duty Six Flags employees who were wearing clothing (t-shirts) with similar colors. Just prior to the park closing on the day of the attack, Six Flags security responded to complaints inside the park that the same group that later attacked Martin was verbally threatening park customers. Six Flags security observed the same group in front of the park at closing time moving toward the Six Flags West parking lot, but saw no threatening behavior at that time. In the crowded West parking lot, the group followed the customers they had threatened inside the park and made more threats before the customers left in their vehicles. There is no evidence that Six Flags security responded to or was aware of the threats made by the group *374 in the West parking lot. Six Flags security stationed in front of the park shortly after closing saw the same group walking away from the park toward the CCT bus stop, and then, well after closing, saw blue lights from Cobb County police cars responding at the CCT bus stop where the group attacked Martin.
1. On the above evidence, Martin contended at trial that the criminal attack on him at the CCT bus stop was foreseeable to Six Flags; that the attack occurred on an approach to the park; and that Six Flags was liable under OCGA § 51-3-1 for failing to provide adequate security to prevent the attack. I find that, because there was no evidence establishing that Martin was attacked on the Six Flags park premises or approaches, even assuming the attack at the bus stop was foreseeable, Six Flags had no duty to prevent it and was entitled to judgment as a matter of law.[68]
Although the criminal attack occurred about 200 feet outside the park premises, Martin contends that the jury verdict and judgment imposing liability on Six Flags under OCGA § 51-3-1 should be affirmed because evidence showed that the attack occurred on an approach to the park within the meaning of the statute, and that Six Flags failed to exercise ordinary care to keep the approach safe from a foreseeable attack while he was an invitee.
Premises and approaches are not the same under OCGA § 51-3-1; rather, “[p]remises and the approaches to those premises are the two areas the owner must use due care to keep safe.” Todd, 258 Ga. at 196. In Motel Properties, 263 Ga. at 486, the Supreme Court construed “approaches” to mean
that property directly contiguous, adjacent to, and touching those entryways to premises under the control of an owner or occupier of land, through which the owner or occupier, by express or implied invitation, has induced or led others to come upon his premises for any lawful purpose, and through *375 which such owner or occupier could foresee a reasonable invitee would find it necessary or convenient to traverse while entering or exiting in the course of the business for which the invitation was extended. By “contiguous, adjacent to, and touching,” we mean that property within the last few steps taken by invitees ... as they enter or exit the premises. It is only within the confines of this limited approach that Todd[, supra,] imposes a duty on a landowner to exercise ordinary care over property not within the landowner’s control.
Id. at 486. Thus, Motel Properties defined “approaches” to be property “directly contiguous, adjacent to, and touching” the entry ways to the “premises under the control” of the owner, but limited that definition by concluding it applied only to “property within the last few steps taken by invitees... as they enter or exit the premises.” Id. at 486. The location of the attack on Martin, about 200 feet from the park premises, was clearly not within the last few steps taken by Martin as an invitee as he exited the park premises on foot, so there was no evidence that the attack was located on a contiguous approach to the premises. But Motel Properties also noted exceptions to the above-stated definition of contiguous approaches, and held that “under certain circumstances non-contiguous property can be deemed an approach because the landowner extended the approach to his premises by some positive action on his part, such as constructing a sidewalk, ramp, or other direct approach.” Id. at 486 (citations and punctuation omitted). For this kind of exception to apply, the owner must take positive action to exercise dominion or control over a public way or another’s property for the owner’s benefit. Id. at 486. Before finding that an owner has extended an approach to his premises over a noncontiguous public way or property,
[t]he requirement of an act reflecting a landowner’s positive exercise of dominion over a public way or another’s property is necessary in order to avoid imposing upon invitors an unknowable and impossible burden for maintaining an undefined circumference of properties.
Id. at 486 (citation and punctuation omitted). Without a positive act demonstrating the owner’s control over a public way or another’s property, there is no basis for concluding that the owner has extended the approach to his premises over that noncontiguous area, and the owner has no duty under OCGA § 51-3-1 to exercise ordinary care to keep that extended area safe for invitees. Id. at 486, n. 6. Moreover, *376 the duty imposed under OCGA § 51-3-1 on a premises owner to keep an approach to the premises safe for invitees is “circumscribed by his right in the approach.” Todd, 258 Ga. at 196.
If his right in the approach is the fee then the duty under OCGA § 51-3-1 is the exercise of due care by one who has the rights of an owner of a fee. He has the widest latitude in the use of the approach and must exercise due care within that framework to keep the approach safe. If his right in the approach is an easement his duty is to use due care toward his invitees in the exercise of his rights under the easement. He has a more limited framework than the owner of a fee. His duty does not require him to do things not permitted under the easement. If the approach is a public way his duty under OCGA § 51-3-1 is to exercise due care within the confines of his right in the public way. His rights in the public way may be quite limited but nonetheless exist.
Id. at 196.
The decisions in Todd and Motel Properties, supra, concerned injuries caused by physical defects in property located outside the premises and whether those defects were located on an approach to the premises. Nevertheless, both decisions provide guidance on the present issue — whether under OCGA § 51-3-1 the noncontiguous property where the criminal attack on Martin occurred was an approach to the park premises on which Six Flags had a duty to protect Martin from the attack. The evidence shows that the attack occurred at the CCT bus stop, located about 200 feet from the park premises, on public property owned by Cobb County adjacent to the intersection of Six Flags Parkway and South Service Road. As Motel Properties makes clear, to conclude that a premises owner has extended the approach to his premises over a noncontiguous public way, there must be evidence of a positive act demonstrating the owner’s control over the public way. Motel Properties, 263 Ga. at 486. And under Todd, if the claimed approach is a public way, the owner’s dutyunder OCGA § 51-3-1“is to exercise due care within the confines of his right in the public way.” Todd, 258 Ga. at 196. As an example of control over noncontiguous property where the claim is that a physical defect in the property caused injury, Motel Properties cited to evidence that a premises owner took positive action to exercise control by constructing “a sidewalk, ramp, or other direct approach” over the property. Motel Properties, 263 Ga. at 486. Martin contends the record contains evidence that Six Flags took similar positive action to extend the approach to its premises over the Cobb County *377 public property at the CCT bus stop where the attack occurred. There is evidence that, for the benefit of its business, Six Flags used barricades and signs to direct pedestrian and vehicular traffic of its invitees along Six Flags Parkway adjacent to the bus stop, and that Six Flags worked with Cobb County to cut grass and pick up trash to maintain the appearance of the Parkway and adjacent public property. During busy periods at the park, Six Flags would also deploy its own security staff and off-duty Cobb County police officers employed by Six Flags to help on-duty Cobb County police direct traffic in public ways leading to the park.
Even assuming this was evidence that Six Flags took positive action to exercise rights to control pedestrian and vehicular traffic in those public ways and to physically maintain those public ways as an approach to the park, this is not evidence that Six Flags had or exercised any right to control security against a criminal attack in those public ways. Martin’s claim is not that Six Flags failed under OCGA § 51-3-1 to keep a noncontiguous approach safe from a physical defect that caused his injury. Rather, Martin claims that Six Flags failed under OCGA § 51-3-1 to keep a noncontiguous approach, located on a public way, safe from a foreseeable criminal attack that caused his injury. Cobb County, as the governmental entity which owned the public way where the criminal attack occurred, had the duty to provide police protection to keep the public way safe from any attack. See Dept. of Transp. v. Brown, 267 Ga. 6, 8-9 (471 SE2d 849) (1996); Ga. Const. of 1983, Art. I, Sec. I, Par. II (protection of persons and property is the paramount duty of government). Six Flags had no such duty and no ability to control the County’s provision of security. The public way where the criminal attack occurred was located in Cobb County police precinct 2, in which Cobb County deployed police officers who responded to any security issues in public areas around the park. There is no evidence that Six Flags acquired or exercised any right to control the provision of security from criminal attacks occurring on public property outside the park. Contrary to the majority’s statement, there is no evidence that Cobb County police allowed or required that Six Flags provide security against criminal activity in the area around the CCT bus stop or in any other public area owned by Cobb County. There is no basis for the majority’s inference that Six Flags provided security against criminal activity in “hot spot” areas on public property near the bus stops. The testimony given by a Cobb County police officer (who had worked off-duty for Six Flags for 30 years) that the bus stop areas were “hot spots” around closing time at the park referred to high levels of vehicular and pedestrian traffic in the area, not criminal activity. The same police officer testified that there had been no fighting incident in the bus *378 stop area prior to the attack on Martin, and that no attack like the gang assault on Martin had ever previously occurred in or around the park. Six Flags security officers did not intervene on Cobb County property to provide security, and they did not respond to the criminal attack on Martin at the CCT bus stop. Cobb County police officers responded to the criminal attack on Martin and conducted an investigation. Six Flags employed off-duty Cobb County police officers at the park, and sometimes deployed those off-duty officers to direct vehicular and pedestrian traffic along public ways leading to the park. But Six Flags did not employ the off-duty Cobb County officers to exercise any right held by Six Flags to provide security from criminal attacks in the public ways. Rather, Six Flags hired the off-duty police officers with the understanding that they retained their official duty to enforce the law and maintain the peace, and if the officers exercised their discretion to respond to security issues in public areas around the park, they did so in the discharge of their official duties as police officers. Stryker v. State, 297 Ga. App. 493, 494 (677 SE2d 680) (2009) (law enforcement officers have general duty to enforce the law and maintain the peace and carry this responsibility on and off duty).
In short, even if Six Flags exercised rights to control pedestrian and vehicular traffic and to physically maintain the public way leading to the park, there is no evidence that Six Flags had any right to control the provision of security to prevent a criminal attack on the noncontiguous public way where the attack against Martin occurred. It follows that there is no basis to find that the attack occurred on an approach to the park on which Six Flags had a right to provide security to protect Martin within the meaning of OCGA § 51-3-1. Motel Properties, supra; Todd, supra. Accordingly, as a matter of law, Six Flags had no duty to exercise ordinary care under OCGA § 51-3-1 to keep the public way safe from the attack on Martin. Motel Properties, 263 Ga. at 486, n. 6.[69]
*379 2. Martin also claimed that, even if the criminal attack occurred outside the Six Flags park premises and approaches, Six Flags was liable because it was a foreseeable attack caused by Six Flags’ failure to exercise ordinary care under OCGA § 51-3-1 to keep the park premises and approaches safe while he was an invitee prior to leaving the park.
In support of this claim, Martin cites to the decision in Wilks v. Piggly Wggly Southern, 207 Ga. App. 842 (429 SE2d 322) (1993), where this Court sanctioned a claim pursuant to OCGA § 51-3-1 seeking to impose liability on a premises owner for a criminal attack that occurred outside the premises and approaches controlled by the owner. Wilks was an invited shopper at the Piggly Wiggly grocery store located in a strip mall. Id. at 842. When Wilks left the store premises at night, evidence showed that two men were loitering near the door of the store. Id. The men followed Wilks as he walked away from the store premises past two other stores to the end of the mall, and continued to follow Wilks as he walked another 20 to 25 yards beyond the mall to an unlit area where the men attacked Wilks. Id. There was evidence that, two or three months before Wilks was attacked, another store customer was the victim of a purse snatching in the parking lot in front of the store. Id. at 843. Other evidence showed that potential attackers were loitering near pay telephones in front of the store, and that they appeared to be “pretending to use the telephone but actually were watching for victims.” Id. Evidence showed that, even though the store attempted to stop loitering around the pay phones, and stationed store employees in the parking lot after dark, “individuals continued to loiter” near the store at night. Id. at 844. On these facts, Wilks brought a premises liability claim against the Piggly Wiggly store pursuant to OCGA § 51-3-1 claiming that the store failed to exercise ordinary care to provide security to protect him from a criminal attack it had reason to foresee. The evidence was undisputed that the attack on Wilks occurred in an area the store did not own or control. Id. at 843. The trial court granted summary judgment in favor of Piggly Wiggly on the basis that the attack did not occur on the store premises or approaches controlled by *380 Piggly Wiggly. Id. But this Court reversed. Despite undisputed evidence that the attack occurred outside the store premises and approaches on property not owned or controlled by Piggly Wiggly, Wilks found that the attack was foreseeable; that Piggly Wiggly had a duty under OCGA § 51-3-1 to Wilks, as an invitee, “to guard against injury from dangerous characters,” and to protect Wilks “from the known dangers posed by loiterers after dark on [the store’s] premises”; and that a jury should decide if Piggly Wiggly had provided sufficient security to protect Wilks from the attack. Id. at 843-844.
I conclude that Wilks was wrongly decided and should be overruled. The evidence was undisputed in Wilks that the criminal attack occurred outside the store premises and approaches when Wilks was no longer an invitee, and at a location where Piggly Wiggly had no right to exercise control over security to prevent the attack. In Motel Properties, 263 Ga. at 486, the Supreme Court reaffirmed the principle that imposition of the duty under OCGA § 51-3-1 on a premises owner to exercise ordinary care to keep the premises and approaches safe for invitees is predicated on the owner’s right to control that property. Even if the criminal attack on Wilks after leaving the premises and approaches was foreseeable, Piggly Wiggly had no duty under the plain language of OCGA § 51-3-1 to prevent the attack at that location. Just as the Supreme Court noted with respect to approaches in Motel Properties, limiting liability under OCGA § 51-3-1 to third-party criminal attacks that occur on the premises and approaches controlled by the owner “is necessary in order to avoid imposing upon invitors an unknowable and impossible burden for maintaining [security over] an undefined circumference of properties.” Motel Properties, 263 Ga. at 486 (citation and punctuation omitted).[70]
Accordingly, while Martin was an invitee on the Six Flags park premises and approaches, Six Flags had a duty under OCGA § 51-3-1 to exercise ordinary care to protect him from foreseeable criminal *381 attack on the premises and approaches under its control.[71] But OCGA § 51-3-1 imposed no duty on Six Flags, while Martin was an invitee, to protect him from a criminal attack — even a foreseeable attack — that subsequently occurred at a location outside the park premises and approaches, where Six Flags had no right of control over security. Whether analyzed in terms of the duty imposed to keep the premises and approaches safe, or in terms of causation, there is no basis to impose liability under OCGA § 51-3-1 on the premises owner for a third-party criminal attack against a former invitee, which occurs at a location off the premises and approaches. “A property owner is not an insurer of an invitee’s safety, and an intervening criminal act by a third party generally insulates a proprietor from liability unless such criminal act was reasonably foreseeable.” Ratliff v. McDonald, 326 Ga. App. 306, 312 (756 SE2d 569) (2014) (citation and punctuation omitted). Under OCGA § 51-3-1, a premises owner may be held liable for a criminal attack on an invitee occurring on the premises or approaches because, when the attack is foreseeable, the statute imposes a duty on the owner to protect the invitee from the attack by providing security sufficient to keep safe the premises and approaches under the owner’s control. Sturbridge Partners, 267 Ga. at 785-786. Thus the duty imposed on the owner by OCGA § 51-3-1 to keep the premises and approaches safe is the basis for finding that a foreseeable criminal attack on the premises or approaches is not an intervening proximate cause that insulates the owner from liability. But OCGA § 51-3-limposes no duty on the premises ownerto provide security at a location off the premises and approaches to prevent a criminal attack against a former invitee, even if the attack is foreseeable. In the absence of such duty, the general rule applies that a criminal attack against a former invitee off the premises and approaches intervenes as the sole proximate cause of injury from the attack ánd supersedes a claim that the attack on the former invitee was caused by the owner’s failure under OCGA § 51-3-1 to provide adequate security on the premises or approaches. See Bradley Center v. Wessner, 250 Ga. 199, 202-203 (296 SE2d 693) (1982). Moreover, for the reasons set forth above, including an owner’s lack of ability to prevent *382 criminal attacks occurring off the premises and approaches, a claim that an owner’s failure to provide adequate security on the premises or approaches was a concurring proximate cause of a subsequent criminal attack off the premises and approaches alleges negligence too remote to constitute a proximate cause of the attack. See McAuley v. Wills, 251 Ga. 3, 7 (303 SE2d 258) (1983). For example, in Godwin v. Olshan, 161 Ga. App. 35 (288 SE2d 850) (1982), we rejected a claim that a landlord’s alleged breach of duty under OCGA § 51-3-1 to provide adequate security in common areas of the shopping center premises under his control was a contributing cause of a criminal attack against a tenant which occurred in an adjacent portion of the premises over which the landlord had no control. We found the tenant’s claim that better security in the landlord’s common areas would have deterred the criminal attack failed on the issue of causation “because of the extraordinary speculation inherent in the subject of deterrence of men bent upon criminal ventures.” Id. at 37 (citation and punctuation omitted). Arefusal to allow recovery on this basis is a policy decision that these are plain and undisputed cases where causation fails as a matter of law, and is simply another way of saying “that the defendant was under no duty to protect the plaintiff from the injury which in fact occurred.” McAuley, 251 Ga. at 7.
For these reasons, in Case No. A15A0828, the judgment imposing liability against Six Flags pursuant to OCGA § 51-3-1 should be reversed, and the case remanded with directions to enter judgment in favor of Six Flags.
3. I would find Martin’s cross-appeal in Case No. A15A0829 either moot or without merit.
(a) Martin claims the trial court erroneously denied his request to instruct the jury on the “voluntary undertaking” doctrine as an alternative cause of action against Six Flags for negligent provision of security. I find no error. First, the only cause of action set forth by Martin against Six Flags in the pre-trial order was a premises liability claim pursuant to OCGA § 51-3-1. Martin was not entitled to a jury instruction on a cause of action not advanced in the pre-trial order. Ga. Dept. of Human Resources v. Phillips, 268 Ga. 316, 318 (486 SE2d 851) (1997); OCGA § 9-11-16. Second, there was no evidence to support the instruction.
(b) Martin contends that the trial court erred by denying his request to enter the judgment against Six Flags effective as of the verdict date, which erroneously deprived him of $422,534.22 of post-judgment interest against Six Flags. This enumeration of error should be rendered moot by reversal of the judgment against Six Flags in Case No. A15A0828.
*383 Decided November 20, 2015
Reconsideration denied December 16, 2015
Holland & Knight, Laurie W. Daniel, Leland H. Kynes, Mellori E. Lumpkin, Vernon M. Strickland, Heather A. Calhoun; Carlock, Copeland & Stair, Charles M. McDaniel, Jr., Wayne D. McGrew III, for appellants.
BondurantMixson & Elmore, Michael B. Terry, NaveenRamachan-drappa; Deitch & Rogers, Gilbert H. Deitch, Andrew T. Rogers; Michael L. Neff, T. Shane Peagler; Weinberg, Wheeler, Hudgins, Gunn & Dial, Earl W. Gunn, Shannon V. Barrow, for appellee.
I am authorized to state that Chief Judge Doyle joins in this dissent.

 In the same suit, Martin also brought assault and battery claims against named and John Doe individual attackers, and Six Flags asserted that additional known and unknown nonparty attackers should be apportioned fault for Martin’s injury pursuant to OCGA § 51-12-33.

 References in this opinion to the premises “owner” includes “owner or occupier” of the premises under OCGA § 51-3-1.

 Although it is not necessary to determine whether the criminal attack on Martin was foreseeable, there was a lack of evidence showing a prior attack on or near the park remotely similar to the random and brutal physical attack on Martin by multiple gang members. Six Flags was aware of numerous prior instances of minor gang-related violence and threats of violence at the park. But the only prior gang-related incident even approaching the nature and extent of the violent nature of the Martin attack was the shooting at the MARTA bus stop between gang members, which was provoked by a fight between the rival gang members. “In determining whether previous criminal acts are substantially similar to the occurrence causing harm, thereby establishing the foreseeability of risk, the court must inquire into the location, nature and extent of the prior criminal activities and their likeness, proximity or other relationship to the crime in question.” Sturbridge, 267 Ga. at 786. The Martin attack was not foreseeable to Six Flags because it was an unprovoked, random, physical assault by a rampaging gang, which bore no likeness to any prior criminal activity in or near the park.

 Even assuming that the attack on Martin was foreseeable, and that the attack occurred on an approach over which Six Flags had the right to provide security, Martin’s claim under OCGA § 51-3-1 fails as a matter of law for an additional reason. Martin was no longer a Six Flags invitee after he left the Six Flags park premises and approaches, visited a nearby hotel, and then returned to the park premises after the park had closed (at 9:00 p.m.) for the sole purpose of waiting for a bus. Martin’s status as an invitee or licensee on the business premises is determined by the nature of his relation or contact with the premises owner. Armstrong v. Sundance Entertainment, 179 Ga.App. 635, 635 (347 SE2d 292) (1986). “The test is whether the injured person at the time of the injury had present business relations with the owner of the premises which would render his presence of mutual aid to both, or whether his presence on the premises was for his own convenience.” Id. (citation and punctuation omitted). “[T]he requirement that an invitee not go beyond the limits of his invitation extends to the temporal dimension as well as the spatial: one who uses the premises of a merchant at a time beyond that *379 to which an implied invitation extends is a mere licensee.” Id. at 636. When Martin returned to the park premises after the park had closed, he did so for his own convenience — to wait on a hus. Accordingly, Martin returned to the premises after closing time, not as an invitee to the park for the mutual benefit of the parties, but as a licensee for his sole convenience. Id.; Clark v. Rich’s, Inc., 114 Ga.App. 242 (150 SE2d 716) (1966). Because Martin was not an invitee when the injury occurred, his claim under OCGA § 51-3-1 failed as a matter of law. Armstrong, 179 Ga. App. at 635-636. Six Flags raised this argument in its motions for a directed verdict and for judgment notwithstanding the verdict, and contended in its brief on appeal that, at the time of the attack, Martin was a CCT invitee as he waited on the hus, not a Six Flags invitee.

 For example, in Wilks, supra, by what standard was Piggly Wiggly to discern whether a particular individual on its premises, who engaged in no overt criminal activity, might he loitering with the intent to follow a store invitee off the premises and attack the invitee? Even if Piggly Wiggly had reason to suspect that the individual had this intent, and ejected the individual from the premises, how would this prevent the individual from simply waiting off the premises to attack the invitee? And if liability is to be imposed on a business like Piggly Wiggly for an attack against an invitee who has left the store premises and approaches, at what distance from the premises is the business still liable for the attack? After an invitee on foot has been followed for a half mile? After an invitee in a vehicle has been followed for three miles? It is simply not reasonable to construe OCGA § 51-3-1 to impose a duty on premises owners to prevent injury to immediate former invitees (or potential invitees) caused by third-party criminal attack off the premises and approaches controlled by the owner.

 OCGA § 51-3-1 does not foreclose the possibility that a foreseeable criminal attack against an invitee that initially occurs on the owner’s premises or approaches may be a proximate cause of an injury to the invitee that subsequently occurs outside the premises and approaches. For example, an invitee may suffer an injury that occurs outside the premises and approaches while attempting to escape from an attack which occurred on the premises. On those facts, imposition of liability on the premises owner under OCGA § 51-3-1 would be based on showing that injury resulted from a foreseeable criminal attack that occurred at a location on the premises or approaches where the owner’s right of control at that location provided means to prevent the attack.